DEBI MILLER,                          :
                                      :
            Plaintiff                 :
                                      :
      v.                              :   Case No. 2:17-cv-87
                                      :
                                      :
ROBERT ZINK,                          :
CHRISTOPHER MURPHY,                   :
AND STACEY EDMUNDS-BRICKELL,          :
                                      :
            Defendants.               :


## OPINION AND ORDER

Plaintiff Debi Miller ("Miller") owned and operated
Dooda's Daycare in North Bennington, Vermont. On May 13, 2016,
Miller and her employees at the daycare center noticed that one
of the children in their care was not well. Miller called 911
and the child was taken to a hospital. Once in medical care, the
child was diagnosed with a serious virus, received treatment,
and made a full recovery.

After this incident, Miller was charged with reckless
endangerment and cruelty to a child. The Vermont Department for
Children and Families brought an allegation that she placed a
child at risk of harm. Eventually, all charges and allegations
against Miller were dismissed. Miller brought this suit against
various government actors alleging false arrest, malicious

prosecution, intentional infliction of emotional distress, and deprivation of her Fourth and Fourteenth Amendment rights. Defendants now move for summary judgment.

For the reasons set forth below, Defendants' Motion for Summary Judgment is **granted in part and denied in part**. Summary judgment is granted as to Count II. Summary judgment is granted on Counts I, III, and IV as they relate to Defendant Zink. Summary judgment is denied on Counts I, III, and IV as they relate to Defendants Murphy and Edmunds-Brickell.

## Background

### The Incident on May 13, 2016

The following narrative of the morning comes from Miller's statements to investigators. While the parties dispute the exact times and certain particulars of the morning, it is undisputed that the following is what she told to investigators and represents her version of the facts.

According to Miller, the child, S.L., was dropped off asleep at 7:45 a.m. with employee Kristie Clough. **ECF 46 at ¶ 25-26**. Miller alleges that Clough asked the child's father how her evening was and whether the child had taken any medications. *Id.* The father did not mention that anything might be wrong with the child. *Id*. Miller arrived sometime between 8:00 and 8:15 a.m., at which point S.L. was still asleep. *Id***. at ¶ 27**. After Miller's arrival, Clough attempted to wake the child up but S.L.

would fall back asleep almost immediately. *Id.* **at ¶ 27, 29**. Miller took S.L. from Clough and noted that S.L. seemed "really droggy [sic]." *Id.* **at ¶ 30**.

Miller told Clough to call S.L.'s mother, but S.L.'s mother could not provide an explanation for the child's symptoms. **ECF 46 at ¶ 31**. Miller instructed Clough to tell the mother to come pick up S.L. *Id*. **at ¶ 32**. The mother said she would call right back. *Id*. at ¶ **33**.

The mother called back at 8:53 a.m. and Miller told her that the child "really needs to be picked up." *Id.* **at ¶ 35, 54**. The mother said it would take her about 20 minutes to get there. *Id*. Miller responded that she was not comfortable waiting 20 minutes. **ECF 46 at ¶ 36**. At that point, Miller does not remember if she told the mother she was calling 911 or if she just hung up the phone. *Id*.

The mother called S.L.'s doctor's office at 8:57 a.m. *Id.* **at ¶ 55**. After speaking with S.L.'s mother, the doctor's office called Dooda's Daycare. *Id*.

According to Miller, just as she was holding the phone to call 911, she received a call from S.L.'s doctor's office. *Id*. **at ¶ 37**. Miller explained to the doctor's office that S.L. was very sleepy and lethargic. *Id*. The doctor's office asked if she had called 911 and Miller told them she was just about to do so. **ECF 46 at ¶ 39**.

After hanging up with the doctor's office, Miller called 911. 911 records show that the call was received at 9:05 a.m. **_Id_. at ¶ 56, ECF 51-1 at ¶ 56.**

Miller maintains that it was only after placing the 911 call that the child's symptoms started to change for the worse. **ECF 46 at ¶ 57**. S.L. became pale and started to display stutter breath. **_Id_.** Medical personnel took S.L. to the Emergency Department of the Southwestern Vermont Medical Center in Bennington, Vermont, where she was treated by Dr. Paul Vinsel. **_Id_. at ¶ 22**. S.L. arrived at the hospital at 9:28 a.m. S.L. was eventually transported to Albany Medical Center via the LifeNet helicopter. **_Id_. at ¶ 85.**

**The Investigation**

Later during the day on May 13, 2016, S.L.'s doctor submitted a complaint to the Child Development Division ("CDD") of the Vermont Department for Children and Families ("DCF"). **ECF 46 at ¶ 4.** The complaint stated:

> A parent called me in tears this morning as Dooda's had called her to come pick up her 12 month old who whey were having trouble awakening – would only open eyes briefly and had shallow breathing. Mom did not have a car and was waiting for a ride. My nurse case manager (at my direction) called Dooda's to urge them to call 911. My nurse reports that Debbie (at Dooda's) seemed to be fairly nonchalant. The child was transported by EMS but required intubation (a breathing tube) and transfer to Albany Medical Center (Cause is still unknown). I am concerned that they don't

> have a firm grasp on handling emergencies or
> even what constitutes an emergency. I have had
> parent's tell me that their children are not
> allowed to attend the daycare the day after
> immunizations. This doesn't make sense and is
> amplified by not understanding on their own
> that this was a 911 emergency.

*Id.* Because the complaint concerned a daycare provider, it was referred to the Residential Licensing and Special Investigations Unit ("RLSIU") of DCF. *Id.* **at ¶ 7**. Defendant Stacey Edmunds (now Stacey Edmunds-Brickell) accepted the complaint and assigned the case to Defendant Chris Murphy. *Id.* **at ¶ 8**.

Detective Sergeant Robert Zink, another Defendant in this action and detective with the Vermont State Police Special Investigations Unit, was notified of a possible child abuse investigation and coordinated with the investigators from RLSIU. *Id.* **at ¶ 11**.

Between May 23 and 26 of 2016, Trooper Zink interviewed nine witnesses about the incident, including Clough, other employees of Dooda's Daycare, Dr. Vinsel, and S.L.'s mother. **ECF 46 at ¶ 15-24**. Zink interviewed Miller twice. *Id.*

Trooper Zink alleges that during his investigation, he uncovered multiple discrepancies between Miller's version of events and those offered by other employees and S.L.'s parents. **ECF 45**.

First, despite what was said by Dooda's Daycare employees, S.L.'s father denied ever being asked any questions about S.L.'s

evening and if she had taken any medications. **ECF 46 at ¶ 41.**
Second, the records of interviews with other employees of
Dooda's Daycare revealed slightly different timelines. **ECF 46 at
¶ 42-45; ECF 45 at 17; ECF 51-1 at ¶ 28, 34, 41, 42, 44.** There
were inconsistencies as to when Miller arrived and when Clough
and Miller first tried to wake the child. *Id*. Third, employees
of Dooda's Daycare who were present that morning disagreed over
whether S.L.'s temperature was ever taken. **ECF 46 at ¶ 46.** There
were also discrepancies, in Miller's own telling, of when
employees began using a washcloth to try and wake S.L**. *Id*. at ¶
47.**

During Zink's investigation, he also spoke with Dr. Vinsel.
*Id*. **at ¶ 88.** Vinsel stated that "[t]he child was so altered
that, you know, the mental status was so abnormal that I have a
hard time believing that a daycare would see that and not
recognize, hey, this is really bad." *Id*.

Zink also discovered that while there were video cameras
installed inside the daycare center, the actual recording unit
had not been working for some months prior to the incident. **ECF
46 at ¶ 92-97, Ex. O at 4-6.** Miller told Zink the recording unit
was not in the facility but at her home on the day of the
incident. **ECF 51-1 at 92-97.**

During the investigation, Zink learned that during the 19
months leading up to the incident with S.L., the daycare center

had received 10 violations for non-compliance with licensing regulations which ranged from food safety violations to three instances of corporal punishment. **ECF 46 at ¶ 89-91, ECF 45 at 21**. Some of these violations resulted from CDD's review of surveillance video from the daycare center in December 2015. *Id.*

Additionally, Trooper Zink alleges that during his investigation, "there was reason to believe that [Miller and her employees] had rehearsed their stories prior to meeting with investigators": "While Miller and her staff would give oddly-specific information about certain events, their stories would fall apart upon further questioning." **ECF 45 at 16**. In two employees' telling of events, they could not account for approximately 45 minutes to an hour of the morning. *Id.* **at 20**. Neither one could offer a plausible explanation for the unaccounted for time. *Id.* In Zink's affidavit, he avers that during one interview with a Dooda's Daycare employee, he asked whether "Miller had told her what to say or not to say [and] she broke eye contact with me and looked down and away from me and said no. This appeared to be deceitful based on my observations of her throughout the interview." **ECF 46, Ex. G**.

**The Charging Decision and Subsequent Proceedings**

During the course of his investigation, Trooper Zink met with the State's Attorney for Bennington County, Erica Marthage, and her Deputy State's Attorneys. **ECF 46 at ¶ 98**. Zink has

admitted that he told Marthage he believed Miller needed to be considered for criminal charges. *Id.*

It is undisputed that on May 25, 2016, Zink was directed by Marthage to charge Miller with violations of 13 V.S.A. § 1025 (reckless endangerment) and 13 V.S.A. § 1304(a) (cruelty to a child). *Id.* **at ¶ 100**. Zink was also directed by Marthage to request from the criminal court a condition of release that Miller not be allowed contact with any child under the age of 18. *Id.* **at ¶ 101**. The Clerk of the Court denied the request and instead issued a condition of release that Miller have no contact with children under the age of 10 years. *Id.* **at ¶ 102**.

Trooper Zink then contacted Miller asking her to come to the Shaftsbury Barracks for further questioning and instructing her to contact her attorney. **ECF 46 at ¶ 103**. Miller came to the Shaftsbury Barracks where she was photographed, fingerprinted, and served with a Conditions of Release Order, requiring her court appearance and prohibiting contact with children under 10. **ECF 46 at ¶ 104-05; ECF 51-1 at ¶ 105**. After signing the conditions of release and agreeing to appear in Bennington Criminal Court on June 6, 2016, "Miller left the Barracks on her own volition." **ECF 46 at ¶ 106**.

Later that day, Zink authored a press release about the issuance of the criminal citation. *Id.* **at ¶ 107**.

On June 6, 2016, Miller came to Bennington Criminal Court. *Id.* **at ¶ 108.** She was not arraigned and did not appear before a judge but was given a new date to appear. *Id.* Before the date of her next appearance, the criminal charges against Miller were dismissed for lack of probable cause. *Id.* **at ¶ 110.** Miller was never arraigned. After the criminal charges were dismissed by the Court, Trooper Zink had no further involvement with the investigation of Miller and the incident with S.L. **ECF 46 at ¶ 109, 112.**

While the criminal charges were dropped, RLSIU still continued to investigate Miller as a possible child abuser. *Id.* **at ¶ 131.** When an RLSIU investigation concludes, the division determines if the allegations are substantiated or unsubstantiated. **ECF 46, Ex. Z at 1.** Defendant Murphy was tasked with deciding whether to recommend Miller for substantiation of two allegations: (1) Neglect and (2) Risk of Physical Harm. **ECF 46 at ¶ 132.** As part of his investigation, Murphy sought the opinion of Dr. Joseph Hagan, who performs consulting work for DCF. *Id.* **at ¶ 133.** Murphy emailed Dr. Hagan a summary of the incident. *Id.* **at ¶ 134.** In response, Dr. Hagan opined that Dooda Daycare's response had been "far below the standard of care that one would expect of an untrained dayperson in any Vermont community where access to EMS services is readily available through the state's 911 system." *Id.* **at ¶ 136.**

Based "on all the facts Murphy learned during his investigation," Murphy recommended that Miller be substantiated for Risk of Harm but not for Neglect. ***Id*. at ¶ 145-46**. Defendant Edmunds-Brickell approved the substantiation determination.

On July 26, 2016, Miller was provided a written Notice of Substantiation Recommendation and Intent to Place Name on Child Abuse and Neglect Registry. ***Id*. at ¶ 148.** The Notice of Substantiation informed Miller that if she failed to request review by August 17, 2016, her name would be placed on the Child Protection Registry. ***Id*. at ¶ 150**.

Miller timely filed a request for a review of this recommendation. ***Id*. at ¶ 151.** On February 7, 2017, the Registry Review Unit issued its decision overturning the substantiation decision. ***Id*. at ¶ 154.** Miller's name was never placed on the Child Protection Registry. **ECF 46 at ¶ 152.** However, between July 26, 2016, when RLSIU issued its substantiation decision, and February 7, 2017, when the Registry Review Unit overturned that decision, Miller was prohibited from working in a daycare. **ECF 51-1 at ¶ 152.**

## Suspension of Daycare License and NBCC Application

The same day that criminal charges were brought against Miller, the Deputy Commissioner of the CDD also made the decision to suspend Miller's daycare license. **ECF 46 at ¶ 113, ECF 51-1 at ¶ 113**. On June 24, 2016, a week after the criminal

charges were dismissed, the CDD reinstated Miller's daycare license. **ECF 46 at ¶ 115**.

Also on June 24, 2016, the CDD provided Miller with a Licensing Report which had been generated after the incident with S.L. *Id.* **at ¶ 116**. The Licensing Report found Dooda's Daycare to be in violation of three regulations: (1) failing to have written procedures for sick or injured children and medical emergencies; (2) failing to provide the child's parent and the CDD with a written report within two working days of an accident or injury that required the services of a medical professional which occurred while a child was in attendance; and (3) failing to adequately train staff. *Id*.

Around this time, Miller began working with Krista Bump, a former employee of Dooda's Daycare, to reopen the daycare center. Bump submitted an application to open the North Bennington Children's Center (NBCC) at the same address as Dooda's Daycare. *Id.* **at ¶ 119-122.** Miller reached out to families who had been clients at Dooda's Daycare. Ten out of 30 families expressed an interest in returning to NBCC. **ECF 51-1 at ¶ 158.**

CDD informed Miller that there could not be two daycare licenses for the same location, so Miller voluntarily agreed to give up the license to Dooda's Daycare in order to proceed with the application for NBCC. **ECF 46 at ¶ 123-24.** Miller was also

told that the application for NBCC had to be in her name. **ECF 51-1 at ¶ 125.** On July 27, 2016, Miller's application for NBCC was denied: Miller had not passed the record check requirement because of RLSIU's substantiation of the Risk of Harm charge. **ECF 46 at ¶ 126-27.** Miller was informed that should she "wish to pursue the possibility of becoming an Early Childhood Program even with this substantiation," she could request a variance. *Id.* **at ¶ 128.** Miller did not request a variance, but, as mentioned above, appealed the substantiation decision itself. **ECF 46 at ¶ 130, ECF 51-1 at ¶ 125.**

After her substantiation decision was overturned, there was nothing preventing Miller from getting a new daycare license. **ECF 46 at ¶ 155.**

## Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At the summary judgment stage, courts must examine the evidence in the light most favorable to the nonmoving party. *Sheppard v. Beerman*, 317 F.3d 351, 354 (2d Cir. 2003). In deciding a motion for summary judgment, the trial court's function "is not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and drawing all inferences in favor of the nonmoving

party, a rational juror could find in favor of that party."
*Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

**Discussion**

Plaintiff's Second Amended Complaint contains six counts. Count I makes a 42 U.S.C. § 1983 claim alleging that Miller's rights were violated through false arrest, malicious prosecution, and the deprivation of her daycare license. Count II makes a separate false arrest claim solely against Defendant Zink. Count III alleges a separate claim of malicious prosecution and Count IV alleges intentional infliction of emotion distress. Lastly, Count V brings a claim for compensatory damages and Count VI alleges punitive damages.

## I. Claims Against Defendant Zink

Miller brings several claims against Trooper Zink: false arrest and malicious prosecution under both state and federal law, as well as a state law claim of intentional infliction of emotional distress.

### A. False Arrest and Malicious Prosecution Claims

Trooper Zink argues that the false arrest and malicious prosecution claims against him should be dismissed because he did not violate Miller's constitutional rights. Regarding the false arrest claim, Zink argues that Miller was never "seized," a necessary element of false arrest. As for the malicious prosecution claim, Trooper Zink argues that the claim must be

dismissed because it was State's Attorney Marthage, not Zink, who made the ultimate decision to charge Miller.

Even assuming that Miller's claims survive these initial hurdles, summary judgment is still warranted on the false arrest and malicious prosecution claims against Trooper Zink because Trooper Zink is entitled to qualified immunity.

When accused of making a false arrest, an officer is entitled to qualified immunity under federal law if there was "arguable probable cause" at the time of arrest. *Jenkins v. City of N.Y.*, 478 F.3d 76, 87 (2d Cir. 2007). Likewise, an officer is entitled to qualified immunity from suit on a claim of malicious prosecution if there was "arguable probable cause" to charge the plaintiff. *See Jean v. Montina*, 412 F. App'x. 352, 354 (2d Cir. 2011). The standards are similar under Vermont state law. *See Cook v. Nelson*, 167 Vt. 505, 511 (1998)(finding that under Vermont law, a law enforcement officer is entitled to qualified immunity for a state tort law claim of malicious prosecution if the officer's "determination that there was probable cause . . .although erroneous, was objectively reasonable"); *Treon v. Whipple*, 212 F. Supp. 2d 285, 292 (D. Vt. 2002) (holding that since defendant acted with arguable probable cause under federal law, he was also entitled to qualified immunity under Vermont state law).

"Arguable probable cause exists 'if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.'" *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (quoting *Golino v. City of New Haven*, 950 F.2d 864, 868 (2d Cir. 1991)). Although courts generally view facts in the light most favorable to the non-moving party at the summary judgment stage, a court must still "neutrally determine whether th[e] information [known to the officer at the time] gave rise to probable cause." *Benn v. Kissane*, 510 F. App'x 34, 37 (2d Cir. 2013)(emphasis added).

When Trooper Zink had finished his investigation, he had the following information. First, he had two opinions from medical providers that something had gone wrong. One opinion came from S.L.'s doctor's office. The other came from Dr. Vinsel, who had treated S.L. at the Southwestern Vermont Medical Center and told Trooper Zink that the child's status was so abnormal that he had "a hard time believing" that the daycare would not recognize this was an emergency situation. Second, Trooper Zink's investigation discovered discrepancies between Miller's timeline of events and those offered by other employees, including inconsistencies over when and how the child was treated. Third, Zink knew that Dooda's had received multiple violations in the past, which had been recorded on video. Video

of the incident with S.L. was unavailable and Miller had not reported the violation to DCF. Fourth, during Trooper Zink's interviews with daycare staff, he had reason to believe that employees of Dooda's Daycare had rehearsed their statements and been told what to say by Miller.

These facts amount to arguable probable cause: a law enforcement officer of reasonable competence could find that there was probable cause. Because arguable probable cause existed, Trooper Zink is entitled to qualified immunity on both the federal and state law claims of false arrest and malicious prosecution.

Summary judgment is thus **granted** on Count II. Summary judgment is also **granted** on Counts I and III as they relate to Trooper Zink.

### B. Intentional Infliction of Emotional Distress Claim

To make out a claim of intentional infliction of emotional distress under Vermont state law, a "plaintiff must show that [Defendant] 'engaged in outrageous conduct, done intentionally or with reckless disregard of the probability of causing emotional distress, resulting in the suffering of extreme emotional distress, actually or proximately caused by the outrageous conduct.'" *Cate v. City of Burlington*, 194 Vt. 265, 277 (2013) (quoting *Fromson v. State*, 176 Vt. 395, 399 (2004)). A claim of intentional infliction of emotional distress must

establish conduct that goes "beyond all possible bounds of decent and tolerable conduct in a civilized community." *Fromson*, 176 Vt. at 399.

As discussed above, Zink had arguable probable cause to investigate and cite Miller. Zink's conduct thus cannot be found to be "extreme and outrageous" as a matter of law: Arguable probable cause means that officers of reasonable competence could disagree about whether probable cause existed. Accordingly, Zink's actions in investigating and citing Miller cannot be beyond the bounds of decent and tolerable conduct.

Summary judgment is **granted on Count IV** as it relates to Trooper Zink.

## II. Claims Against Murphy and Edmunds-Brickell

### A. Malicious Prosecution Claim

Defendants Murphy and Edmunds-Brickell argue that summary judgment should be granted on the malicious prosecution claims against them because they are entitled to qualified immunity.

"[I]t is well settled that child protective services workers are entitled to qualified immunity for their conduct during the course of abuse investigations." *Wilkinson ex rel. Wilkinson v. Russell*, 182 F.3d 89 (2d Cir. 1999). While "there is no constitutional right to be free from an erroneous child abuse substantiation," *Wright v. Yacovone*, No. 5:12-cv-27, 2014 WL 1165834 at *9 (D. Vt. Mar. 21, 2014), the Second Circuit has

recognized a constitutional right to be free from an abuse finding made with no reasonable basis. *See Wilkinson*, 182 F.3d at 104 ("An investigation passes constitutional muster provided simply that case workers have a 'reasonable basis' for findings of abuse."). Since at least 2002, case workers have been on notice that "flawed" abuse investigations "will generate risk of legal sanction." *Id*. at 107.

Murphy and Edmunds-Brickell argue that they had a reasonable basis for substantiation based in large part on the opinion of Dr. Hagan, which stated that Miller's actions had been "far below the standard of care that one would expect of an untrained dayperson in any Vermont community where access to EMS services is readily available through the state's 911 system." **ECF 46 at ¶ 136**. Miller argues that this opinion was based largely on misinformation. She argues that Murphy incorrectly communicated what happened to S.L. that morning and greatly exaggerated the events (repeatedly telling Dr. Hagan that S.L. was unconscious and could not be woken up) such that Hagan's opinion was not based on the reality of the situation.

In an email from Murphy to Dr. Hagan, Murphy stated that daycare providers had "considerable difficulty waking [S.L.] and keeping her conscious despite jostling her, speaking to her, wiping her with a cool cloth, and tickling her." **ECF 46, Ex. E at 161**. Murphy also wrote that "[t]he mother's cell phone call

log indicate [sic] that the daycare first contacted her at 8:35 (approximately 20-minutes after the providers discovered that they could not keep [S.L.] conscious)." *Id.* **at 162**.

In his deposition, Dr. Hagan averred that when he met with Defendant Murphy, the incident was communicated in such a way that Dr. Hagan understood the child to be "unarousable." **ECF 51, Ex. 5 at 21**. Dr. Hagan elaborated that "[u]narousable to me means literally that someone attempts to awaken or arouse a patient and is unsuccessful. . . . They cannot wake them up." *Id*. When asked if his opinion of the situation would change if "the child was arousable, was always able to be woken up, in fact simply presented as lethargic," Dr. Hagan replied that that would be a "very different scenario" and he would "have to reassess" his opinion. *Id*.

Viewing the facts in the light most favorable to Miller, there is a question of fact as to whether Dr. Hagan had been given an accurate picture of the incident and whether Murphy intentionally used inaccurate or misleading language when communicating with Dr. Hagan. This dispute of fact precludes a finding of qualified immunity regarding Murphy and Edmunds-Brickell. Additionally, if Dr. Hagan was given incorrect information it calls into question the rational basis of the substantiation decision. Because these fact questions remain,

summary judgment is inappropriate for Defendants Murphy and Edmunds-Brickell on claims of malicious prosecution.

Summary judgment is **denied** as to Count I as it pertains to malicious prosecution by Murphy and Edmunds-Brickell. Summary judgment on Count III is **denied** as it relates to Murphy and Edmunds-Brickell.

### B. Substantive Due Process Claim

"To allege a violation of substantive due process, [a] plaintiff must claim: (1) a valid property interest or fundamental right; and (2) that the defendant infringed on that right by conduct that shocks the conscience or suggests a gross abuse of governmental authority." *King v. N.Y.C. Emps. Ret. Sys.*, 212 F.Supp.3d 371, 401 (E.D.N.Y. 2014). Viewing the facts in the light most favorable to Miller, the Court finds that she has adequately pleaded both prongs of a substantial due process claim.

As explained in this Court's order on the earlier Motion to Dismiss, courts have held that "an abuse finding [which] results in the deprivation of a license and occupation" may "implicate due process liberty rights." ECF 26 at 15; *Dupuy v. Samuels*, 397 F.3d 493, 503 (7th Cir. 2005) (finding that due process is "squarely implicated" when "child care workers effectively are barred from future employment in the child care field once an indicated finding of child abuse or neglect against them is

disclosed."). The Second Circuit has not spoken directly on this issue. In *Valmonte v. Bane*, the Second Circuit found that Valmonte adequately pleaded a "stigma plus" procedural due process claim because her inclusion on the state's child abuse registry counted as defamation and "that defamation occur[ed] in conjunction with a statutory impediment to employment." 18 F.3d 992, 1001 (2d Cir. 1994). In this case, Miller's name was never placed on such a registry. She is also not making a stigma plus claim, but rather arguing that the denial of her license for approximately nine months constitutes a substantive due process violation.

Here, the substantiation decision made by Murphy and Edmunds-Brickell rendered Miller a prohibited person unable to obtain a childcare license to work in her chosen field from July 2016 through February 2017. This severe interference effectively destroyed her business and resulted in her being unable to re-open a daycare business on that property.

Additionally, Miller alleges that Dr. Hagan was intentionally given misinformation about the incident with S.L. and that the report based on this misinformation greatly contributed to the revocation of her daycare license. If true, this conduct may rise to a level of indecency that shocks the conscience, and certainly suggests "a gross abuse of

governmental authority." *King*, 212 F. Supp. 3d at 401 (E.D.N.Y. 2014).

For these reasons, summary judgment is **denied** regarding the substantive due process claims against Defendants Murphy and Edmunds-Brickell in Count I.

### C. Intentional Infliction of Emotional Distress Claim

As mentioned, in order to make out a claim of intentional infliction of emotional distress under Vermont state law, a "plaintiff must show that [Defendant] 'engaged in outrageous conduct, done intentionally or with reckless disregard of the probability of causing emotional distress, resulting in the suffering of extreme emotional distress, actually or proximately caused by the outrageous conduct.'" *Cate*, 194 Vt. at 277 (2013) (quoting *Fromson*, 176 Vt. at 399 (2004)).

As discussed in greater depth above, there is a question of fact regarding whether Dr. Hagan was intentionally given misinformation about the incident. Such conduct could rise to the level of outrageous and extreme behavior. This question of fact precludes summary judgment on this claim for Defendants Murphy and Edmunds-Brickell.

Summary judgment on Count IV is **denied** with regards to Defendants Murphy and Edmunds-Brickell.

## Conclusion

For the reasons set forth above, Defendants' Motion for Summary Judgment is **granted in part and denied in part**. Summary judgment is granted as to Count II. Summary judgment is granted on Counts I, III, and IV as they relate to Defendant Zink. Summary judgment is denied on Counts I, III, and IV as they relate to Defendants Murphy and Edmunds-Brickell.

DATED at Burlington, in the District of Vermont, this 20th day of August, 2019.

/s/ William K. Sessions III
William K. Sessions III
District Court Judge
